**No. 47077.—Protest 933914–G of Swift & Co. (Jacksonville).**

KEEFE, Judge: In this action, arising at the port of Jacksonville, Fla., certain oleo stearine, imported from Argentina, was assessed for duty at 1 cent per pound under the *eo nomine* provision for the same in paragraph 701, Tariff Act of 1930. In addition thereto a tax of 3 cents per pound was levied upon the merchandise under section 701 of the Revenue Act of 1936, amending section 601 (c) (8) of the Revenue Act of 1932, as amended. Such tax was assessed upon the ground that oleo stearine is a derivative of tallow. The plaintiffs concede that the merchandise was properly classified as oleo stearine under paragraph 701, but it is claimed that the merchandise is not subject to the additional duty of 3 cents per pound under section 701.

Section 701, Revenue Act of 1936, provides as follows:

SEC. 701. TAX ON CERTAIN OILS.

The first sentence of section 601 (c) (8) of the Revenue Act of 1932, as amended, is amended to read as follows:

(8) * * * tallow, inedible animal oils, inedible animal fats, inedible animal greases, fatty acids derived from any of the foregoing, and salts of any of the foregoing; all the foregoing whether or not refined, sulphonated, sulphated, hydrogenated, or otherwise processed, 3 cents per pound: * * * any article, merchandise, or combination * * * 10 per centum or more of the quantity by weight of which consists of, or is derived directly or indirectly from, one or more of the products specified above 'in this paragraph or in section 602½ of the Revenue Act of 1934, as amended, a tax at the rate or rates per pound equal to that proportion of the rate or rates prescribed in this paragraph or such section 602½ in respect of such product or products which the quantity by weight of the imported article, merchandise, or combination, consisting of or derived from such product or products, bears to the total weight of the imported article, merchandise or combination; * * · *

At the trial the record in the case of *Swift & Co., a corporation* v. *United States,* 27 C. C. P. A. 181, C. A. D. 83, was offered and admitted in evidence. In that case the merchandise also consisted of oleo stearine. This court found that the merchandise was derived directly or indirectly from tallow and was therefore properly the subject of the additional duty of 3 cents per pound.

Upon appeal the court in reviewing the evidence and affirming the decision of this court stated in part as follows:

It clearly appears from the authorities cited in the trial court's decision, as well as from other dictionary definitions and the Summary of Tariff Information, 1929, on the Tariff Act of 1922, Schedule 7, page 1031, and it is conceded by counsel for appellant that, as commonly understood, oleo stock is merely a high-grade edible tallow.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

It is also well settled that it will be presumed, in the absence of evidence to the contrary, that the commercial meaning of a tariff term is the same as its common meaning. Furthermore, the burden of proving commercial designation is upon

the party who asserts that the commercial meaning of a tariff term differs from its common meaning. *Rice Millers' Association, etc.* v. *United States and Oberle (Inc.), supra.*

Appellant has established, at least *prima facie,* in the case at bar that oleo stearine is produced from oleo stock; that oleo stock and tallow are definitely uniformly, and generally considered and dealt in in the trade and commerce of the United States as separate and distinct articles of commerce; that oleo stock commands higher prices than tallow; and that tallow would not be accepted as a good delivery on an order for oleo stock, although, in some instances, oleo stock might be accepted as a good delivery on an order for edible tallow.

\*　　\*　　\*　　\*　　\*　　\*　　\*

"Tallow," as commonly understood, has two meanings. Broadly, it includes the animal fat from which oleo stock and rendered tallow are produced. \* \* \*

No evidence was introduced by appellant for the purpose of establishing that the commercial meaning of the term tallow differs from its common meaning, and that in the trade and commerce of the United States the term "tallow," definitely uniformly, and generally, includes only *rendered* animal fat. That being so, we must assume, for the purpose of this decision, that as commonly and commercially understood the term "tallow" includes the harder and less fusible unrendered beef fats.

Oleo stock and rendered tallow being derivatives of the harder and less fusible unrendered beef fats, they are both derivatives of tallow. It is evident, therefore, that proof that oleo stock and *edible* tallow are generally, uniformly, and definitely recognized in the trade and commerce of the United States as separate and distinct commercial articles is not sufficient to establish that oleo stock and oleo stearine are not produced from tallow.

In view of the fact that section 701 of the Revenue Act of 1936; *supra,* covers not only tallow but also any article derived either directly or indirectly therefrom, we must hold that the involved oleo stearine is subject to the additional duty of 3 cents per pound provided for therein. For the reasons stated, the judgment is affirmed.

In view of the foregoing language of the appellate court, the plaintiff assumes the burden of proving commercially that raw fats are never regarded as tallow, and such term is definitely, uniformly and generally confined to rendered beef and mutton fats, and consequently as rendered beef and mutton tallow may not be used to produce oleo stearine, the same is not dutiable as a derivative of tallow. To that end nine witnesses testified that they were in the business of selling tallow and that they disagreed with the common dictionary definition of tallow as comprehending raw fats; that all tallow sold by them was rendered, and that in their purchasing and selling of tallow throughout the United States they had never heard the term "tallow" applied to raw fats. Several witnesses employed by various packing houses also testified that raw fats were sold under the term "shop fat" to Darling & Co. and that said firm, in buying tallow, buys only a rendered product; that raw fats were sold to renderers as fat, and that the plaintiff, as well as Wilson & Co., dealt in "tallow" only as a rendered product.

The Government produced ten witnesses who testified that they had sold raw fats as rough tallow, raw tallow, and shop tallow to various packing houses including Swift & Co., the plaintiff herein, and receipts for the same from such packing houses which were admitted in evidence herein refer to the sales as rough tallow; that in all their business experience such fats had always been known in the trade in the purchasing and selling of the same as tallow. Some of the witnesses sold these raw tallow products at wholesale to packing houses in quantities as large as 200,000 pounds per week. Others had bought at wholesale under the name of "tallow" from packing houses for the purpose of rendering the same. Such purchases and sales involving unrendered tallow were made by 13 packing houses located in 11 different states.

Five witnesses employed in the various branches of Cudahy & Co. and Armour & Co. as production men testified that the raw fats trimmed from cattle in their cutting departments were designated as rough tallow, or as tallow suet, regular

tallow, and scrap tallow and Armour & Co. sold such material from one department to another under such designations. These witnesses were all agreed that in their long experience such fats had always been known and regarded by them as tallow. One of these witnesses testified that all tallow was divided into raw or unrendered tallow and rendered tallow.

From a careful consideration of the voluminous record before us we are of the opinion that the plaintiff has failed to establish that the term "tallow" is confined to rendered fats. Consequently, in the trade and commerce of the United States, the term "tallow" is not definitely, uniformly, and generally confined to rendered beef and mutton fats, but in at least eleven states the term includes unrendered fats. Inasmuch as the oleo stearine herein is derived from unrendered tallow, we hold that it is properly dutiable as assessed by the collector under the ruling of our appellate court in the *Swift* case, *supra*.

Judgment will be rendered accordingly in favor of the defendant.